## QUIMBY *v.* VANDERBILT.

A part owner of one of several lines for the transportation of passengers, running in connection over different portions of a route of travel, may contract as principal for the conveyance of a passenger over the whole route, and such contract may be established by the circumstances, notwithstanding the passenger receive tickets for the different lines signed by their separate agents.

Passage tickets are generally to be regarded as tokens rather than contracts, and are not within the rule excluding parol evidence to vary a written agreement.

The defendant was the owner of steamships sailing between New-York and the eastern port of the transit route across the isthmus of Nicaragua. He was also part owner of steamships forming part of a line sailing between the western port of the transit route and San Francisco. He was furnished by the corporation owning and managing the transit route with passage tickets for the conveyance of persons across the isthmus, by their steamboats and carriages, which he sold to passengers who embarked in his steamships from New-York, and returned those which he did not sell; but was not an agent of or employed by, the transit road. Upon the door of the office at New-York, occupied by one Allen, the defendant's agent, and which he frequently visited. was posted an advertisement, headed "Vanderbilt's Line between New-York and San Franciso," and signed "Allen agent," in which the route by the steamships on both oceans and across the isthmus was described and commended. The agent, at that office, sold to the plaintiff, for a gross sum, three tickets, which severally imported that he was entitled to be carried to and across the isthmus and thence upon a particular vessel on her next voyage to San Francisco, and delivered to them a card, signed by himself, describing the route, and stating that passengers are speedily conveyed across the isthmus by the Nicaragua transit; *Held,* that evidence of these facts was sufficient to authorize a jury to find that the defendant contracted as principal for the prompt conveyance of the plaintiff across the isthmus, and to charge him with damages for a detention.

THE plaintiff sued the defendant in the New-York Common Pleas, and complained that shortly prior to the 5th of March, 1852, the defendant being a carrier of passengers between New-York and California, undertook, in consideration of $250 paid by the plaintiff, to carry him from New-York to San Francisco, by the route across the Isthmus of Nicaragua, and that such passage, on the Pacific coast of

Quimby *v.* Vanderbilt.

the continent, should be in the second cabin of the steamship Independence, on her then next voyage to San Francisco ; that, pursuant to the contract, the plaintiff was carried to the port of San Juan de Nicaragua, on the Atlantic side of the isthmus, but the defendant neglected to provide for his conveyance across ; on account of which he was delayed a long time and when he finally arrived at San Juan del Sur, on the Pacific side, the Independence had sailed, and the defendant neglected to furnish any means for the continuance of the plaintiff's journey ; whereby he was forced to return to New-York at his own expense, after being exposed for a considerable time to the sickly climate of the isthmus, to the injury of his health, &c.

The answer denied the contract stated, but admitted an agreement by which the defendant, as the owner of a line of steamships between New-York and Nicaragua, undertook to carry the plaintiff to the latter point ; and it alleged that the plaintiff contracted with " The Accessory Transit Company of Nicaragua" for his passage across the isthmus, and with Robert & G. L. Schuyler, the owners of a steamship on the Pacific coast, for his passage by water from the western side of the isthmus to San Franciso ; that one Daniel B. Allen, acting separately as the agent for those several lines, furnished the plaintiff with separate tickets, at the price of $90 for the Atlantic passage, $35 for that across the isthmus, and $125 for that on the Pacific line. The other material allegations of the complaint were put in issue.

On the trial in the Common Pleas the plaintiff proved that he went to an office situated at Battery-place, New-York, and inquired the price of a through ticket to San Francisco, and whether there would be any delay ; he was told that the price was $250, and that he would not be delayed over two or three days ; that he thereupon made an agreement with D. B. Allen, the person in charge of the office, who is a son-in-law of the defendant, for his passage to San Francisco, for $250 ; that his name was taken down,

and he was allowed to select his berth in the steamships; Allen gave him a card and three tickets; the card was in these words:

"VANDERBILT'S LINE FOR CALIFORNIA, *via* NICARAGUA.— Nearly 1000 miles shorter than any other route; composed of the new first class steamships, Northern Light, Prometheus, Daniel Webster; connecting by the Nicaragua transit route. Having but twelve miles of land carriage, by which passengers are speedily and comfortably conveyed through a beautiful and healthful country, with the steamers North America, Pacific, Independence, S. S. Lewis; one of which will leave San Juan del Sud, the Pacific terminus of the transit route, with the passengers for San Francisco, without delay.

"N. B.—Travelers to the golden region are cautioned against the misrepresentations of those in the service of rival lines; they are solicited to call at the only office of this line, No. 9 Battery Place, (up stairs,) where full and correct information may be obtained, and where only passages may be secured.

D. B. ALLEN, *Agent.*"

Two of the tickets were for the steamships, and both these were headed "Vanderbilt's Line;" one stated the plaintiff had paid his passage in the steamship Prometheus on her next voyage from New-York to San Juan de Nicaragua, and the other that he had paid his passage in the steamship Independence on her next voyage from San Juan del Sur to San Francisco; they were signed: "D. B. Allen, agent, per J. Rintoul;" the other ticket stated that the plaintiff was entitled to a passage across the Isthmus of Nicaragua by the line of the "Accessory Transit Company," and it was signed: "Isaac C. Lea, Secretary."

The evidence to connect the defendant with the office where this transaction took place, and its business, was as

Quimby *v.* Vanderbilt.

follows: He owned the vessels on the Atlantic side, including the Prometheus, and D. B. Allen was his agent to manage the business which was transacted by means of them; Allen was also the agent for and had the general control and management of the line through to San Francisco; there were two apartments, the business office and the private office of Allen, in the latter of which the defendant had a desk, and the usual entrance to the inner or private office was through the other. The defendant was at the office sometimes two or three times a day, but he was not there every day; he was consulted by Allen about the affairs of the line; and the witness, who was employed in the business upon the isthmus, swore that the defendant was the chief manager of the line, and that Allen was the principal agent; there was an advertisement published by Allen in the daily papers in New-York, and posted on a board at the door of the office, and which was read by the plaintiff when he came to engage his passage, as follows:

" VANDERBILT'S NEW LINE BETWEEN NEW-YORK AND SAN FRANCISCO.— THE ONLY THROUGH LINE *via* NICARAGUA.— A number of days shorter than any other route. Composed of the following first class steamships between New-York and San Juan de Nicaragua: Prometheus, Captain Churchill; Daniel Webster, Captain Baldwin. And between San Juan del Sud and San Francisco: North America, Captain Blethen; Pacific, Captain Jarvis; Independence, Captain Wakeman.

" These steamers are all new, were built expressly for this route, and for speed, safety and accomodations are unsurpassed. From San Juan de Nicaragua to San Juan del Sud, passengers will be promptly conveyed over the new transit route of the Nicaragua company, having but twelve miles of land transportation, and at that point embark in one of the above named Pacific steamers for San Francisco.

"The great saving of distance by this route over others heretofore established, and a speedy and comfortable transit between the two oceans, through a beautiful and healthful country, offer inducements to the traveling public equalled by no other line.

D. B. ALLEN."

The Accessory Company is a corporation created by the laws of the State of Nicaragua, in Central America, but the corporators or stockholders are residents of the city of New-York, and the defendant is one of them. It has a president and board of directors and other officers. This company had no interest in the steamships, nor (as the secretary swore), anything to do with them. Its business was to transport passengers from one sea to the other. So far as it issued passage tickets in New-York, they were, as a general thing, delivered to the defendant before the sailing of each steamship, he ordering such number as he wanted; and a day or two after the ship sailed he would pay for so many as he had sold, at $35 each, and return the rest. If other persons bought tickets of the company, which was not usual, they paid $40 each.

One W. H. Brown was the general owner of the steamship Independence, but at the time of this transaction R. & G. L. Schuyler had an absolute title in form to her as mortgagees, and they were, as R. Schuyler swore, mortgagees in possession. She was run as one of the ships of the line from New-York to California, under a contract originally made with Brown, which was continued by the Schuylers after they acquired the title. They had nothing to do with her direction, management or expenses; these matters being under the charge of Allen, who was the agent of the Schuylers, and accounted to them for the clear profits, after paying expenses and deducting a commission to himself. Robert Schuyler swore that he wanted to withdraw this vessel from the line, and had so told the defendant, and the defendant

had agreed that she might be withdrawn as soon as she could be spared. The other ships on the Pacific side, viz., the North America and Pacific, were owned, one-half of each by the defendant, and the other half by other parties. Allen swore positively that the route across the isthmus was not a part of the line, and that neither he (the witness) or the defendant had anything to do with that part of the route, except to sell the tickets of the Accessory Transit Company; and Mr. Lea, the secretary of that company swore that Allen was not its agent. Allen, however, admitted that when persons applied for passage to California by his line, they were charged by him the gross sum of $250, and were not informed as to the distribution of that sum among the proprietors of the several routes.

It appeared that the plaintiff sailed from New-York in the Prometheus on the fifth, and arrived at Nicaragua on the fifteenth of March. No means were provided for taking him across the isthmus, and he was obliged to remain there more than a week, when he embarked in a vessel going up the river. At Castillo rapids he ascertained that the Independence had sailed for San Francisco. When he arrived at the port on the Pacific side, there was no vessel to take him on; and although the company sent off two other steamers while he was there he was not permitted to embark on board either of them. He finally found his way back to San Juan de Nicaragua, and from thence obtained a passage to New-York at his own expense. A steamer of the line, running on the Pacific side, had been lost shortly before this time, and this was the reason why the company could not take on all the passengers arriving after the Independence had sailed.

The defendant's counsel maintained that there was not evidence sufficient to be submitted to the jury, of a contract by the defendant to carry the plaintiff through to San Francisco, and requested that the judge would charge to that effect; but he declined so to charge, and submitted the

question to the jury whether such a contract had been proved; the defendant's counsel excepted. Verdict for the plaintiff for $625. After an affirmance at a general term, the defendant appealed here. Several other exceptions were taken on the trial in the Common Pleas which were not relied on here.

*C. A. Rapello,* for the appellant.

*Richard Goodman,* for the respondent.

DENIO, J.    The plaintiff relies upon an express contract by which, as he alleges, the defendant engaged to cause him to be carried from New-York to San Francisco; and the single question of law involved in the case is, whether there was evidence of such a contract proper to be submitted to the jury. If it should be conceded that there was no such connection between the three lines of transportation as would entitle the defendant, as the representative of the whole, to contract in their behalf for the carriage of persons and property the entire distance from New-York to California, it was yet quite competent for him to bind himself to the plaintiff by an express contract not only to carry him over his own proper portion of the line, but that the other transportation companies should successively take him up upon his arrival at the commencement of their respective routes, and carry him over the same until he should arrive at his destination at San Francisco. The English courts hold that where property is embarked upon a railroad or other line of transportation, addressed to a place beyond the terminus of the line, but which may be reached by other lines of carriage running in connection with it, a contract arises between the first mentioned company and the owner of the property that it shall be carried to its place of destination. (*Muschamp* v. *The Lancaster and Preston Railway Company,* 8 *Mees. & Wels.,* 421; *Watson* v. *Ambergate, &c., Railway Company,* 3 *Eng. L. and Eq. R.,* 497); and

this court has determined that the agent of a railway company may bind his principals by a contract for carriage over other roads running in connection with his own. (*Hart* v. *The Rensselaer and Saratoga Railroad Company*, 4 *Seld.*, 37.) The late Court of Errors, in my opinion very wisely, limited the English rule above mentioned, by holding that evidence was admissible to show that by the course of business a transportation line receiving property without any express contract, undertook only to carry it over its own line, and then place it in the hands of the carriers over the next route and that it discharged its obligation to the owners by delivering it to a responsible company next in order in its passage to the place of destination. (*Van Santvoord* v. *St John*, 6 *Hill*, 157.) All the cases assume that the company to which the goods are delivered may lawfully contract for the performance of the other lines running in connection with its own, as well as for its proper route; and there is no difference in principle, in this respect, between contracts for the carriage of persons and for the transportation of property.

But the defendant's counsel contends that the tickets which the plaintiff received for the passage over the several routes are, in themselves, written evidence of the bargains by which he engaged his passage, and that he is precluded from contradicting them by parol testimony of an entire contract with the defendant. We do not think this a sound position. The tickets do not purport to be contracts. They are rather in the nature of receipts for the separate portions of the passage money; and their office is to serve as tokens to enable the persons having charge of the vessels and carriages of the companies to recognize the bearers as parties who were entitled to be received on board. They are quite consistent with a more special bargain. Being the usual permits which were issued for the guidance of the masters of the vessels and the conductors of the carriages, they would necessarily be given to the passenger to facilitate the

transaction of the business, whatever the nature of his arrangement for passage may have been. Their character as mere tokens is shown by the fact that the defendant received them in large numbers of the Transit Company, not as an agent of that company for the purpose of making bargains in its behalf with others, but to furnish them to persons with whom he expected to deal on his own account. In *Hart* v. *The Rensselaer and Saratoga Railroad Company*, just referred to, the plaintiff had separate tickets for each of the roads over which she traveled, but she was permitted to recover against one of the companies, though unable to show that her baggage was lost on the route of that company. We do not say that the receiving of separate tickets for the different lines is not evidence of some weight upon the question whether the contract was entire, but we hold that it does not come within the rule which excludes parol testimony respecting a contract which has been reduced to writing.

There was positive evidence of a verbal contract between the plaintiff and Allen for carrying the former from New-York to San Francisco. The plaintiff applied at the office to obtain such passage, and he was promised it for $250. The tickets were then given him to secure his admission to the different vehicles of the line. In this, Allen professed to act as the agent or clerk of some one. So far as the steamships on the Atlantic were concerned, he was the agent of the defendant, and no question is made but that he was authorized to bind the defendant thus far. It is equally clear to my mind that he was authorized to bind him by contracts for carrying passengers across the isthmus. The Transit Company did not, as a general thing, sell any tickets to travelers, nor did they make any contracts for passage except with the defendant. To him they sold tickets, in the nature of permits for passage over their route, in such quantities as he chose to purchase. It is proved that neither he nor Allen were agents for the Transit

Company. When he dealt with a traveler, therefore, he bargained on his own account, and not on behalf of the Transit Company. He might have charged more or less than he paid that company. It was certainly possible for him to dispose of one of these permits by an arrangement, with the passenger, so special that the latter should have no recourse to him ; but if he engaged in terms that the purchaser should be carried across the isthmus, and gave him one of the Transit Company's tickets to show his title to be admitted on board their boats and carriages, he was the principal in that contract and must answer for its breach. He placed these tickets in the hands of Allen, who was accustomed to deliver them to passengers in connection with such contracts as the one he made with the plaintiff. Allen admitted on his examination that he charged the gross sum of $250 for the entire passage, without any specification of the amount belonging to the separate branches of the line ; and there is not the slightest evidence that on any occasion he sold the tickets to be taken at the risk of the passenger, or in connection with any arrangement except such as I have mentioned. The facts that the defendant purchased the tickets of the Transit Company ; that he placed them in the hands of his agent Allen for delivery to passengers; that the latter was accustomed to dispose of them in connection with contracts for passage over the entire route, and that he transacted the business in an office occupied also by the defendant, and acted under his general direction, were sufficient *prima facie* to charge the defendant as principal in these contracts.

As the detention, which prevented the plaintiff from reaching the steamship Independence before she sailed, occurred upon the isthmus, the defendant is chargeable in this action when it is shown that such detention was a breach of his contract, even though it should be held that the plaintiff contracted with other parties for his passage upon the Pacific coast. But I think there was sufficient evidence to enable

the jury to find that the defendant was the principal in the contract which Allen made with the plaintiff for the entire passage. The terms of the card which was given to the plaintiff when he received his ticket, and of the advertisement which was posted at the door of the office, which the plaintiff read when he went to secure his passage, looked to contracts for the whole distance. The defendant's connection with the office and with Allen was sufficient *prima facie* to charge him with a knowledge of the contents of these papers, and he is to be looked upon as their author. Being known to both parties to the contract for passage, they afford the means of ascertaining what that contract was, if it were otherwise equivocal. If we add to this evidence the fact that the defendant was the owner of a moiety of two of the steamships which ran on the Pacific side, and that he was a party to the arrangement by which the Independence, owned substantially by the Schuylers, was employed in that navigation in connection with the other routes, a case was made out which was not only suitable for the consideration of the jury, but which in our opinion fully warranted the verdict which they gave.

The judgment of the Court of Common Pleas should be affirmed.

All the judges concurring,

Judgment affirmed.